Okay, good morning everyone. First argued case this morning is number 16-2701 Sequent Performance Products against Hopkins Manufacturing Corporation. Mr. Cooper. Thank you, Your Honor. May it please the court. The board incorrectly concluded that an operating point can be a single reading when accelerated on our outputs. Under the BRI standard, claim interpretation... In the blue brief, you raised the pothole theory. Somebody hits a pothole. Sure. And for support, you cite your experts declaration. Tell me what intrinsic evidence supports that. That's right. So to your point, the intrinsic evidence here is throughout the specification. So the specification... So the issue here becomes what's this is an average. The board concluded the average is a preferred embodiment. It's not the broadest resolution. I think you're transforming my question to what you want. Okay. The pothole theory is, bang, you hit a pothole. Right. Okay, so I'm not talking about averages. I'm talking about that event. Okay. And where is that in the... Yeah, so the point of the pothole theory is not to construe the claim, but the point of the pothole theory is the why. Why does that make sense? In other words, why is averaging the broadest reasonable interpretation and not a preferred embodiment? So here, we're saying averaging is the broadest reasonable interpretation, and I'll cite to you in a moment the specifics. So is there anything other than your expert speculation to support the pothole theory? Absolutely. We have a concurrent litigation. Their witnesses in deposition identify that repeatedly. Their product has the exact same averaging that we do in our product, and their own witnesses, their own witnesses. The point is this, and this is the way... Do we have that in the record? Well, that's an issue here with respect to IPR. It's not in this record. Obviously, it's in the concurrent. But you said speculation. It's not speculation. Both sides agree the why, and all I'm saying is the construction here. This is a very specific issue here. What's the definition of this operating point, right? Right. The point behind pothole theory is simple. All we were just trying to raise with that, Judge Wallach, is that that's the why behind the claim construction. Why it makes sense to have average, and also that was from an inventive step standpoint here. So in other words, identifying that this averaging valuation isn't just some simple thing that's some minor difference from the prior art. Because the prior art had just one reading from the brake control signal. Problem is, if you have only one reading, and like a pothole, or think of a bumpy road, if you're in the southwest in a pickup truck and you're trailering, you're going to hit divots, you're going to hit a lot of bumps. All of a sudden, you're going to have a ton of misreads if it's just doing one reading. The averaging here, what it does is it balances that out. It takes out bad readings. That's the whole point of this. In fact, when you say that's the whole point of this, but as you read through the background in the specification, it seems that the point is the fact that it's automatic. So, I mean, why isn't it reasonable to say that you made it automatic, but you covered both multiple readings and single readings? Sure. So, the specification itself identifies throughout. So, when the question is, okay, what's the specification say about this operating point? Each and every time it's raised, it's identified as an average. So, for example, the definition comes out on column 6 starting at line 49, Your Honor. What it says is that the microcontroller implements an algorithm using a stored average value. Okay, that our position is that's the BRI. We'll get to what that stored average value is. Can you answer my question? Sure, sure. You're doing the same thing that you did to him, which is, my question is, isn't the explanation in the patent for what is novel about this invention is the fact that it's done automatically without manual intervention? That's not the only point of novelty. There's actually a lot in here. So, for example, in that background of the invention, that's column 1, line 24, to your point, the sentence is, some prior outbreak control units have also break control signal from an accelerometer. That's one signal. That's the point. There's more than, and it goes on to talk about how that single point can't be, is manual. There's a manual requirement when you've set up the operation of this. What we're talking about here is during the operation of the brake control unit itself. So, in other words, when you're in the real world conditions, you're braking, what happens here? What happens before braking? What happens during the braking event? That background of the invention, talking about the manual versus automatic, is either factory calibration or the setup. In other words, when the user is actually in the aftermarket installing this into the unit, so that it automatically levels each and every time versus a manual. It's not getting to the question, though, at heart here, which is what is this operating point? So, in other words, the specification here, so when we look at it, what's this operating point, right? Each and every time it raises it as an microcontroller implements an algorithm using a stored average value. I want to stop there. The next thing, if you look at that, it identifies in parentheticals, i.e. preferably, and then it talks about the preferred embodiment, which is this 10 readings at 200 milliseconds per reading. That's a preferred embodiment when you're starting to identify, or how do you figure out the average? How many, how many data points are you using? That's the preferred embodiment here. That's what the board got wrong. 3A, figure 3A of the 993 patent. Right, the curves. Yeah, depicts three signal curves, okay? What is 0.301 on that drawing represented? And what I'm interested in isn't an operating point. Well, to your point, yeah, an operating point is ultimately one value. To your point, absolutely. I'm not denying that. It has to be one value, but here's the thing. It has to be an average. It's like a grade point average. You're averaging out various points, you end up with one value. Is 301 one value? Absolutely. But doesn't the patent define operating point as the reference level? Yes. So, it says that the board's decision, and here's why, Judge O'Malley. You're right. So, there's a rolling average, or some sort of stored average value. So, you have these data points. Algorithm creates what? One value. That's the 301, for example. That's the single average. It's like a grade point average. You ultimately end up with a number, right? What it then says, Your Honor, if you keep reading there, that same sentence you're coming out of, it says, it goes to the next sentence, this reference level. So, it refers back to the last sentence, right? It demonstrates which reference level, which is that rolling average, and then it goes on to say this reference level, or that rolling average, i.e. operating point, which defines, that's definitional, i.e. meaning that is. So, operating point is the reference level. Okay, so what's the reference level? It's that rolling average. Not only is it there, though, Your Honors, it's four other places in the specification. So, column six, line 49, you're absolutely right, identifies, you take an average. That average is called a reference level, or an operating point. It's an average. Same with column seven, lines eight through nine, Judge O'Malley. It says, reference point that was established during the averaging algorithm. See, there it is again. Referencing point. Reference level. But it doesn't say that that's one way to set it? No. It's the, that's my point, Your Honor. It's the only way in this specification. There is no other way. And that's the difference between. You know, there are a lot of limitations in this preferred embodiment, but you don't read all of them. None, in fact. I don't, we don't want a specific, you're right, we don't want a specific number of readings. That's actually a violation of the BRI. All we're saying is. Why would we read some limitations from the preferred embodiment in and not others? Good question. So, it goes back to that term, reference level. The very next term says, i.e. operating point. The operating point here, that's being claimed in claim one, is that reference level. So the question becomes, what's that reference level in the spec? The spec says it's the average, the stored average value of the rolling average. It's right there in that sentence in column six, lines 49 through 55. That is the only basis, and there's four other instances in the specification, whenever that operating point is identified or being described, every time it's an average. The point is, it can't be a single value. Let's talk about. Sure. Time period. In the red brief at 22, Hopkins challenges the definition of period upon which you rely, saying with the board that it could be a single amount of time necessary for a single event to occur. And, and they challenge your definition as taken from a dictionary for people learning English, and, and that, that it actually includes a single action. Yeah. What's your response to that? That's wrong, and here's why. Again, I, under the BRI standard, it all comes back to what the specification says. The specification... Do you need the BRI standard to support your position? The BRI standard does support our position. I say, do you need it to support your position? I think so, in terms, in, in, in this following respect, if I understand your question, because the BRI requires that claim, under the BRI, this is under PPC broadband, for example, claim interpretation must be reasonable, must be reasonable, in light of the specification. So, the question becomes, what's the specification say? How is, how is that claim term being utilized there? Claim interpretation is a matter of law. The BRI applies to factual determinations. I see what you're saying. This is a question of law. In other words, fundamentally, what's the meaning of this operating point? This is a question of law that should be reviewed de novo. So, to the extent this is requiring factual inquiries, that's not needed. That's why I want to understand if your position is that it would be interpreted differently under BRI than under the objective, objectively correct legal construction. Yep, our position is this is a legal issue, not a factual one, because of that intrinsic evidence. In other words, looking at this specification, it is clear that the broadest and the key term, reasonable interpretation here, is the only one that keeps showing up in this specification, which is averaging, that the operating point is derived from that averaging. So, the other stuff, the extrinsic evidence, those facts, are just context in order to support things like, okay, why is this important? It goes more towards, for example, obviousness, if that was an issue for some of these dependent claims. But to your point about the claim construction, fundamentally here, all I'm saying is that the specification here clearly, in its four corners, identifies each and every time this operating point or reference level, as Judge O'Malley identified in the spec, as some sort of averaging. That is not a preferred embodiment. Here's why. So, you make an PTAB's construction in the institution decisions. But how do you reconcile that with what's clear from the record, that you make claim construction arguments before the PTAB. So, didn't those arguments demonstrate that Sequin had a fair opportunity to address the claim construction issue? Yeah. So, my short answer is no to that, Judge Wallach, and here's why. Throughout, so the institution is partially granted, partially denied. Some of the claims actually were denied as well. The issue here was that the board identified this period of time. The parties litigated at length what this period of time in that construction meant. Our position was a period of time is not instantaneous, and that's key because in Robinson, the key prior art reference here, it identifies on column six, starting on line seven, that it's reading an instantaneous acceleration. Our position is instantaneous is not a period of time. Therefore, no anticipation, no obviousness, that limitation is not. I think Einstein wouldn't disagree with you. Well, you will. Yeah, how far can we go with that? Putting that aside, in this context, I, yeah, you know, thankfully Einstein wasn't their expert, I guess, too. Let's put it that way. But we've made it clear that, you know, these institution decisions, they're at a point in time where the board doesn't have the full analysis, the full ability to understand what the party's positions are. Here, you debated this issue at the hearing. Right. You told the board that if they were gonna, they would have to actually clarify their construction and add more to their construction if they were gonna view this as something that would be instantaneous or cover one period of time. So why didn't you have enough? I mean, that's exactly the same circumstances that we've already endured. See, the fundamental problem, though, is this. What we said was to the board is that if you are, if you're not going to follow the standard here for determining claim construction properly under that period of time, if you're gonna say one single reading, even though not once does that appear in this 993 patent, Judge O'Malley, if you're all of a sudden gonna say, well, an operating point could be multiple readings, that's in spades in this patent, or a single reading which doesn't appear one time in here, then that's inappropriate. That was our position, as you know from reading that transcript that's in the appendix. Okay, let's hear from the other side, and we'll save you rebuttal time. Mr. Brown. Thank you, Your Honor. May it please the court. The board explained very thoroughly and clearly how the claim language specification file history of this, the intrinsic evidence, supported its interpretation of automatically acquiring an operating point. What's the difference between operating point and break control signal limitation? Well, the difference is, Your Honor, that it's a temporal difference. So the claim language calls for automatically acquiring an operating point of the rate control signal. The board found that the operating point of the break level signal is that value before breaking occurs, and then the break level signal is what happens during breaking. So there's a temporal distinction between those two things, and it does not read a limitation out of the claim to interpret the claim the way the board did. I don't completely understand the point where the board said that the break control, that the operating point is a point of the break control signal. What does that mean? Well, it's the language itself, Your Honor. I mean, the really means nothing more than the point at which the level at which this thing, whatever this thing might be, is operating. And here the board said temporally, this is the level at which it's operating prior to a breaking event. Then you get a breaking event, and now it does a comparison between the values it's getting during breaking against the value that it determined was the operating point of that level, which was a voltage level. I mean, the board really essentially equates the two, doesn't it? No. It says it's a point of the break control signal, but then it actually seems to equate the break control signal with the operating point. The break control signal is what's coming from the accelerometer. The distinction is when in time. Prior to breaking, that's the operating point. That's the level at which it's operating. During breaking, it then compares the new values, which are different because there's deceleration, presumably, and compares those deceleration values to what it determined was the operating point prior to breaking. So it's all coming from the same source, and the board made an analogy during the... So the operating point is the reference level, right? The operating point is definitionally the reference level. How do you deal with the fact that the patent describes the rolling average setting the reference level? Well, the patent doesn't define the reference level to be an average. The patent introduces the entire embodiment as a preferred embodiment, talks about it as one embodiment. There's no IE signal saying that the reference level, IE the average, unlike where we have the operating point... But there's nothing else in the patent that says what would set the reference level other than a rolling average. But a single embodiment doesn't mean that the claim should be limited to the single embodiment, especially when the patentee is very clear that it is just a preferred embodiment. And in fact, as the board pointed out, there's another reference to operating point in a different operation, which is they disclose in the specification that they go to the in the factory, that they compensate on an accelerometer by leveling the accelerometer. And they say that if the accelerometer is level, then the output should be two and a half volts. And this is at the bottom of column five. But be tempted to turn this around. So you come in and say you're somebody who just uses one reference point. And the question is infringement. I've got to think you would be standing here arguing that there's no infringement because this patent only discloses one type of mechanism for setting the reference level. I would lose that argument if that was the argument I was making, because that's not what this court has said. I mean, this court has said just because there's one embodiment, you do not define the claim to be out that operating point, as I was saying, in column six, after describing how this calibration occurs, the patent says, and this is a column six line three, when the offset is compensated in this position, the output, i.e. the operating point of the amplifier, is 2.5 volts. So there's an example, the board said, where an operating point is referring to a single value, not a calculated average. And it's also an example where an operating point is the sequence of a microprocessor, which the board said rebutted both of sequence positions that the operating point had to involve microprocessor calculation and had to involve an average. The operating point of the amplifier is completely different than the claim operating point here, right? They are coming from the same place, though, Your Honor. The operating point of the amplifier, the amplifier is connected to the accelerometer. So that is the operating point of the accelerometer when they're, in a different time, when they're, when they're calibrating. But the point of the board was that this patent refers to an operating point in that example, which is just a single value, not an average, and not microprocessor driven, so that the board's interpretation of operating point is more consistent with each of the references to operating point as that, as that term is used throughout the specification. You're saying the, the, the, the board defined operating point is, for instance, in the Robinson prior art, is, is, are you relying on the single value actually being on the prior art so that it was necessarily distinguished? I'm not sure I complete... Is that, is that part of the rationale? I don't believe the board relied on Robinson to, to make that distinction. We certainly rely on the single values that Robinson, at least in, in one embodiment, or as... Was Robinson before the board? Yes. Yes, Robinson is the anticipatory reference, Your Honor. That's, that's what I thought, aren't they charged with knowledge of the cited prior art? Oh, but Robinson was not before... Robinson was not in the prosecution, if that's Your Honor's question. I do not believe Robinson was cited on the basis of... It was before the board, though, was it not? It was, it was before the board, absolutely. So Robinson talks about a operating point is the same as Robinson's baseline? Yes. Yes, Robinson says that it develops a baseline, it knows from the baseline at what level that accelerometer output is operating, and it compares that baseline to the values that it receives during a breaking event. Good. Let me take you then to the pothole theory, which, and I don't want you feigning ignorance, I'm quoting from the Gray Brief, where it says, Hopkins feigned ignorance. I always like that kind of language. In it, at the heading of that section on page 22 of the Gray Brief, it says, the pothole theory is not based upon extrinsic evidence, but upon scientific fact. What's your response to that statement? Well, the response is that the pothole theory is not recognized at all in the specification or the intrinsic evidence. There is no issue whatsoever. That was a construct of extrinsic evidence introduced by sequence experts. It's not intrinsic evidence. And in this case law of this court, where you have found that a single embodiment could be definitional, it's because in those specifications, there is at least a strong implication of a definition. And for instance, that there would be an average, and we're better than the prior art because the prior art doesn't address the pothole issue. If that's in the specification, I've got a problem, because the specification is talking about the pothole theory and giving some definitional meaning, aha, maybe this really is an average. But that whole analysis is purely extrinsic evidence. There's another point I'd like to make, which is there is a threshold. It's extrinsic evidence, but they say, so what? It's scientific fact. Well, it has, if it's... I want you to respond, in particular because you feigned ignorance. Well, I don't... I like giving people an opportunity when that happens. I don't understand in the context of this patent that it's important that the device deal with potholes. It's not something they said they were attempting to address. What they say in the specification they're attempting to address is overcoming the fact that when someone installs a prior art brake controller, they have to manually level it. And that's the only thing they were trying to fix. They were not trying to fix potholes. So whether potholes are a big problem or a little problem or make it work a little worse or better is irrelevant to this patent, because that's not the issue they were trying to address. And so there's nothing in the intrinsic record to support it. I have to point out that there's a threshold level decision here that this court has to make. This construction was waived by Sequin below. They never asked the PTAB to find that reference level should be defined as a stored average. In fact, they refused to take that position in the PTAB below. Turning to the appendix... Well, they did argue that it had to be assessed over a period of time, correct? They argued it had to be some type of calculation, but they expressly refused to say what type of calculation. The PTAB quoted it, but if you look at appendix page 404, which is the transcript from the oral argument, Sequin argues, starting at about line 4, you have to do something with that break control signal to create an operating point. As you can tell, I'm avoiding, because we're in the middle of an infringement here, saying what that means. But I'll be more than happy to tell a jury, yeah, you know, a rolling average is an operating point. So they're willing to tell a jury that a rolling average is an operating point, but they were unwilling to tell the PTAB that the PTAB had to limit the claim to a stored average. And that's because they made a tactical decision at the PTAB that they didn't want to be held to a stored average. What page are you on? That was page 404 in the appendix, Your Honor, starting at line 4. So they have to live with that tactical decision that they made. This court reviews claim construction de novo, for sure, but it is still a review. It is not a court of first resort, and by failing to raise the stored average construction that they now advance to this court before the PTAB, they waived this construction. The PTAB found... If they had really waived it, why would the PTAB have felt the need to amend their own construction to make sure that they didn't include it? Well, because they asked the PTAB, Your Honor. They asked the PTAB to do that. Well, I don't have any problem with the notion that they asked the PTAB to look at their construction, but what I'm saying is if the PTAB really thought that this issue wasn't put before it, why would they have amended their construction to basically refute it? Oh, well, because they asked the PTAB for a different construction on these claim terms. I'm not saying they weren't arguing about this claim phrase. This was the claim phrase that was argued, but they wanted a different interpretation. They didn't want to be held to a stored average. They wanted a broader interpretation. Some calculation undefined was the definition that they wanted the PTAB to resolve. They never told the PTAB that this level was defined to be a stored average. The PTAB was not presented with that argument. We argued that there was no definition requiring any kind of calculation. CEQA never told the PTAB that it had to find that the specification defines an operating point as a stored average. They refused to take that position. Specifically, what they wanted the PTAB to say, this is found in the appendix. This is from Patent Owners Response at page 214 in the appendix. After trying to construe the PTAB's construction, they then said, well, if we're wrong with this construction, here's what we'd like you to say. The revised construction should make clear that operating point refers to, quote, a value representing accelerometer output over a length of time other than during a braking event. That nowhere within it asks for a construction that there is a stored average or that the operating point has to be a stored average. You compare that to the construction that they're asking this court to give, and it's entirely different. They've altered the proposed construction and are asking for one that they never asked from the PTAB. Well, they clearly said that it has to be a calculation. In other words, they describe the term acquire as more than just a passive thing, right? Right. And they, and so when you're talking about over a length of time, that implies more than one value, doesn't it? It does imply more than one value, but my point is here, they're asking this court, according to their reply argument at page two, the court should therefore construe the operating point of the brake control signal to mean the stored average value of the accelerometer output that is compared to the brake control signal after the brake pedal of the towing vehicle is depressed. That's different than what they asked the PTAB. They've altered the proposed construction, and under this court's precedent in the cited in in our principal brief, you cannot alter and ask for a new construction on appeal that you didn't present below. I think you might be arguing a distinction without a difference, but anyway. Okay, anything else? Well, you know, the, you did say that this has to be calculated over a length of time, but, but it is true you never actually use the phrase that has to do with the rolling average. I did, actually. It's the next page. Mr. Brown stopped at Appendix 404. It's actually Appendix 405. So the question was asked by one of the judges there. When I said back, yeah, so if we absolutely have to include here whether or not there's two or more values, yes, Your Honor, the construction, if we need to identify that, it would be appropriate to include two or more values. That's the point. 406, I go on to identify that, about prisons of order history. Why were you resisting two or more values? Well, I was uncomfortable because at that point in time, again, the fact that the board at the very end of that oral argument was raising the fact that they were looking to scrap a claim construction blew me away. I mean, that's the honest truth. I mean, that that was a big issue for us. It was a very big surprise for us at that point that we're going to be potentially looking at a different construction. I gave in and said, look, if we're going to go there, it has to be two or more points if we need some sort of definition here. That's what the specification says. That's what period of time means. So at that time, that's what my concern was. Literally, a due process type issue. Are we talking about some sort of different claim construction here? If that's the case, we want to go back and be able to do things like, if you don't agree with that averaging being, for example, in the claim, we want to have the right then to be clear in amendment. The reason is, is this is a good invention here. This is a small town at the country, good engineers that worked at something that was very different than what was out there, including what was in Robinson. And to be hyper linguistic here about what this claim term means, when it's clear from the specification every time, there's five different times it refers to this or another. Just what we wanted was a right to be clear about what our invention was and how it was differentiable for Robinson. Not only that, Robinson is exemplified in that background of the invention, Judge O'Malley. It specifically identifies, again, in that background, some prior art break control units also included a processor for receiving a break control signal. That's Robinson. That's all the prior art out there. We were distinguishing from that, making clear we were averaging. We were doing something different and something better. That was the point here. And all we're saying here, I was surprised at that moment in time in that hearing that that was going to be a potential here. It was a completely different construction. And I wanted to make sure if that happens, and that's why we're here asking in the alternative for a remand, we can go back and utilize the rules if we absolutely have to. I absolutely think, and my client thinks, a claim construction here surrounding a single point, an operating point, is dead wrong based on this specification. But if this court thinks that that's an appropriate construction, we want at least a remand to vacate to allow the clear about what operating point means in light of this specification and be given the opportunity to be clear here how we differentiate, because we do. Going back to it, just a couple points here about where this averaging is. Column 7, again, we talk about reference point that was established during the averaging algorithm. That's lines 8 through 9. Column 7, lines 25 through 27, rolling average reference point. Everywhere we talk about this reference point or reference level, it's an average. Going on, we talk about the word preferably. Again, when I talk about preferred embodiment, to me means 10 readings or some specific number of readings. When we say average, that's not a preferred embodiment. That's the broadest reasonable interpretation. Just like PPC broadband with the term around. Does around mean in circle? Does it also mean in close proximity to? To pull out a dictionary, it can mean both. But in the light of that specification in that case, it only meant encircling. We have no difference here. One final point about, Judge Wallach, about your scientific fact. Absolutely, it's scientific fact. Pretty simple. You know, it's real-world physics, right? Physics 101. And it is feigning ignorance, if you think otherwise. Here's the reason why. If you hit a pothole, right? If you hit a divot when you're off-roading, you will get, under Robinson and that prior art, you're gonna get a false read. You will not break. If you hit a bump, you will get a false read. You will wrongly break when you shouldn't be. That's the issue there. Does that make sense? That is a scientific fact. We don't need experts sitting around telling you that. It's just the truth. With that, that's all we have. We ask that this court construe this claim term correctly, reverse the board's decision regarding anticipation and obvious on those grounds, or in the alternative, remand to allow us to go back, make clear what operating point is, allow us the right to amend under the rules, under the law, and give my client the right to identify what exactly this invention is. Clearly, that's separate and different from the prior art. Thank you. Thank you. Thank you both. The case is taken under submission.